G-IHoldings v. Reliance. Mr. Oshinsky. Good morning, Your Honor. It looks like the minute people heard this was an insurance case, they all cleared out. This is the most interesting case. I don't blend in. Personally, we find it scintillating. It's the story of my life. I haven't traveled from as interesting a spot as... That's okay. I'm listening. Keep going. I know. Thank you very much. I'm glad the Court is still here. I've had courts walk out on me, too, but hopefully not today. I also travel from a warmer clime, Santa Barbara. Not to rub it in, but I hope to see you all there someday. One of our colleagues is in Santa Barbara. I'm sorry, Your Honor? One of our colleagues is in Santa Barbara. Oh, really? Judge Alderser. Oh, okay. May it please the Court, my name is Gerald Oshinsky, still, and I'm here with my colleague, Stephan Weil, at the Council table. We represent G-IHoldings, we think we call it, and Samuel Hayman, the appellant. And if I may, I'd like to reserve five minutes for rebuttal, if that's all right with the Court. The first suit here was brought, what, on January 3rd? The first suit was brought in 1999 or 2000. After the bankruptcy, there was a new case. The Nettles action, January 3rd. Oh, you mean the underlying, yes. The first case against my clients was brought during the time when Reliance's name was still on the underlying insurance policy. The next two cases, the Creditors Committee case and the CCR case, were brought subsequently. That is correct. And then when you went between Reliance and Hartford, you only had, what, a 15-day tail? Is that right? No, the reinsurance agreement said that Hartford was going to reinsure policies that were enforced as of the date of the agreements. So the agreement was, what, July 15th? July 1st. The first agreements were July 1st, 2000. The claims agreements were subsequently. The reinsurance agreement and the asset purchase agreement, where Hartford took over complete control of Reliance, including taking all their employees, taking all their business, taking all their premiums. That's an issue in this case. Well, it's in the agreements, Your Honor. If Your Honors look at the agreements that are in the record, there is no question that under the two initial agreements, and this is, I think, the cornerstone of our appeal, that when Hartford initially argued that the two cases did not relate back to the time when Reliance was on the policy, they were concerned, obviously, that they'd be directly responsible for Reliance's liabilities. But the Reliance policy has, what, an interrelated wrongful wax provision? Well, that provision only works if you treat these as two separate policies. Our client was told, and it's clear from Mr. Fluger's testimony in the lower court, that he viewed this as a continuation, that he thought he was getting exactly the same coverage they had before. My question is, did the Reliance policy have an interrelated wrongful wax provision? Yes, it did, Your Honor. And so what does that mean? Well, in the normal course, when you're dealing with the same insurance company, which has issued multiple policies, the interrelated wrongful wax clause says that when the claim that's filed first is put on the record, claims that come in that relate to the same circumstances relate back. So everything's different. They weren't different, Your Honor. There's no dispute that these three cases all related to the same allegations. They all involve the same allegations, and that is why initially Clarkson took the position that on their first motion to dismiss in the lower court, that these claims did not relate back to Nettles. They argued that since the Reliance policy, in their view, had been canceled, that we could not argue that these two claims related back. So then when my clients in the lower court amended their complaint to bring in the Hartford continuation of the Reliance policy, Hartford switched gears and said, oh, we're sorry, whoops, they do relate back, and they're barred by the interrelated wrongful wax clause. That is not the argument they made in the first instance. We do not dispute. We have a case called Montrose that says that there's no estoppel. Excuse me. I'm sorry. Could you move back? Oh, sure. Move this back a little bit. Sure, thank you, Your Honor. We're either going to listen to the tape or we're going to get a transcript. I have the opposite problem with some of the earlier words. I'm too loud and not too smart. No, no, that's good. I apologize for that. That's all right. We have a case called Montrose Medical from 2001 which says there's no estoppel where the, quote, initial claim was never accepted or adopted by a court, close quote. Now, they may have taken a different position, but was that ever accepted or adopted by a court? The position, they withdrew the position, and the trial judge allowed them to withdraw the position. So it was never accepted or adopted by a court. That is true. But under Ryan and Crystal, Crystal, which succeeds Montrose and actually refers to Montrose, points out that in this circuit it is not a requirement of the courts, the decisions in this circuit, that the prior position be accepted. And I think I would have to say, having read all the cases and fussed with them, there is some confusion in the cases. But I think the prevailing consensus, and Crystal is the last word, that there is not exactly the last word. I gave some attention to Crystal, albeit in a footnote, in Chau versus Roy's construction, where among other things the footnote emphasized that we've also endorsed the view that judicial estoppel is an extreme remedy to be used only when the inconsistent positions are, quote, tantamount to a knowing misrepresentation to or even fraud on the court. Your Honor, we agree and we understand that judicial estoppel is an extreme remedy. It's not the cornerstone of our argument. But we would say that we believe that it was inappropriate for the court to grant summary judgment to Hartford on one of its two inconsistent positions. There was a problem. You would have to show that no lesser sanction is sufficient. That's what Judge Smith wrote in his case. And I understand that, Your Honor. I think that is certainly a correct statement of the law. I think the lesser sanction here is that Hartford should not have been granted summary judgment. At a minimum, this case should be tried on the merits to find out what the ultimate result should be, not on summary judgment. Let me go back to something you said in the beginning. Sure. Robert Pfluger's testimony. Didn't he also testify that he understood there would be two separate policies and that claims under the Reliance policy would remain? He said that, Your Honor, and he absolutely said that. In the very next sentence, he said he understood that he was going to get from Hartford exactly what he got from Reliance. And he said later on that he thought that when they asked him whether you understood that you were covered by Hartford only from the point of the substitution of Hartford for Reliance, he said my understanding was that because of the retroactive date in the policy, which covers all conduct after 1997 as long as claims are made during the policy period, he said my understanding is that I am covered with Hartford since 1997. The testimony that was relied upon by Hartford in the lower court was clipped. If you look at the very next sentence. All right. So where does that leave us on the summary judgment situation? Well, we have alternative. Conflicting testimony. We think there's conflicting testimony. We also think that the agreements are clear, that if you look at the quota share agreement, where Hartford was appointed as Reliance's attorney in fact by the very wording of that agreement to do all the things that Reliance could do, and there is no factual dispute that Hartford took over Reliance's business and their employees. So by virtue of the quota share agreement and the asset purchase agreement, Hartford was dealing with itself subsequently. So where that leaves you, Your Honor, I think is in one of two places. You could decide in our favor that under Venetzanos, where there wasn't not even an agreement in issue, they couldn't find the agreements in that place, that we could be granted summary judgment by this court or at a minimum given the conflicting testimony the case should be remanded for trial. All right. But Venetzanos is a completely different situation, isn't it? Venetzanos is factually different because in that case, the reinsurer, Homestead, set up the insurance company Mutual. It was a shell. It was profoundly factual. It was a shell. In this case, I think if you delve into the facts the way I know this court will do, we have the same circumstance and a different set of facts. Reliance became a shell of Hartford's after the asset purchase agreement and after the quota share reinsurance agreement. Wasn't Reliance in a receivership at that point? Reliance went into receivership. And then they went into a liquidation proceeding. The rehabilitation was converted into a liquidation. Isn't the only time, just to pick up on that point, wasn't the only time that the, you know, Venetzanos said that when the reinsurer controlled the settlement and had 100 percent of the liabilities, then you could have what you're looking for. But in this case, the only time that that occurred was between July 1 and July 15. Ron, I think that is only the case if you look at this from a reinsurance standpoint. But remember, as I said before, the agreement says that Hartford was reinsuring agreements that were in force as of that date. The Reliance policy was in force as of that date. And if you view that policy as a continuation of the Reliance coverage, the in force language protects us and doesn't hurt us. But we're not looking at Hartford as a reinsurer. We're saying Hartford is directly responsible for Reliance's liability. That's what the agreement says. The agreement says that Hartford took on all of Reliance's liabilities. They took all the reinsurance. Reliance, this was not a case where Hartford issued a simple reinsurance certificate. They took over the business. They took the employees. They took the books. But Reliance retained certain control. They were Hartford. Settling claims. They were Hartford employees. I mean, we think that's a, I wouldn't use the word subterfuge, but it was certainly an artifice. Because by that point in time, these employees were Hartford employees. So, in effect, we had two sides of a wooden nickel with Hartford on both sides. Hartford had taken over the business. They were Reliance, in effect, in actuality. Now, they tried to paper that over by saying, well, we're not taking all the liabilities, et cetera. If you look at the reinsurance agreement and the quota share and the asset purchase agreement, they took all the liabilities. They took all the premiums. Liabilities after July 1, 2000? I'm sorry, Your Honor. Or before July 1? I'm sorry. When did they undertake all of the liabilities? As of July 1, 2000, in the asset purchase agreement and the quota share reinsurance agreement. And that's why you get back to the interrelated wrongful acts provision. If the interrelated wrongful acts provision says that claims 2 and 3 that were filed post-July 1, 2000, relate back to January 3 of 2000 when the Nettles claim was filed, it doesn't sound from what you've just said that Hartford has undertaken that. Well, they have undertaken it. If those claims relate back, which, again, was contrary to Hartford's first position in this case. Understood. If these claims relate back, and if we are correct, which we think we are, that those agreements make Hartford responsible for Reliance's conduct as a direct insurer, not as a reinsurer. If they relate back, then Hartford's got the ticket as a direct insurer, and we think that the agreements are clear. The Hartford agreements, they also have an interrelated wrongful acts provision, correct? The underlying insurance, there are directors and officers' liability insurance policies. One, it started with Reliance. It was taken over by Hartford in July. July 15, 2000, they continued the policy until 2002. Those policies are exactly the same. And they contain exactly the same language, exactly the same typos, except for two endorsements added by Hartford and substituting the logo. It went from a snake to a moose. But it seems as if there's a provision, from your perspective, missing, which is that if a claim was filed prior to July 1, 2000, under Reliance's policy, you, Hartford, will cover that. And you just said to me earlier that there is a demarcation of July 1 as to when Hartford actually takes over and is responsible. The first claim came in while the Reliance policy was enforced. So that claim came in under the Reliance policy. So Hartford would have to say that everything under that Reliance policy were responsible for. That's correct. And that's exactly the position they tried to avoid on the first go-around. And then after our client amended his complaint to add the two years of the Hartford continuation of the Reliance policy, Hartford did a big whoops. And so they do relate back because at that time Reliance is out and Hartford is trying to avoid any responsibility. They screwed up there, but the court never relied on it. So we thought about that. The court never relied on it. And I think that the weight of authority in this circuit is that the lack of Reliance is not an impediment to judicial estoppel. But more importantly, we think that these questions are vigorous questions that should not have been decided against our client on summary judgment. Well, this seems like a – the court looked at it, Judge Kavanaugh, and it seems like he was right. This is just a – this is a legal issue. I think – This is not a factual issue. The question is under the agreements, and you keep saying the agreements, the agreements. That's law. That's – what do the agreements say? And it sounds from what you're saying is that there was a cutoff of July 1, 2000, and that you're saying that Hartford was responsible for Reliance's policy obligations relating back to Nettles, when in fact it looks as if, from what you're telling me, they weren't, because there was a cutoff. They picked up liability. They picked up Reliance's liability for the policies that were in force as of the date that Hartford took over Reliance. The first Reliance policy was in force as of the date that Hartford took over Reliance. So any claims that come in subsequently that hit that policy hit the policy that is in force as of the date, and the words as of are the critical words that relate these claims back if they do. But Hartford can't have it both ways. They can't say first, oh, they don't relate back because they're concerned at that moment in time they're going to be directly responsible. And when they realize they have a better argument to push it into their ears, they say, well, we're sorry. We're going to withdraw that argument and make a different argument. And I – We understand your position. I'm glad that's – I'm glad you do. And – If I can do anything to help, I'd be happy to help. We'll have you back on rebuttal. Okay, thank you, Your Honor. Just one small thing. Sure. Did I hear you say that in the conversion it went from a snake to a moose? The – I want to hear from Hartford as to whether or not they are willing to have their logo characterized as a moose. I was kind of hoping it would be the other way around, but it isn't, Your Honor. Thank you. Mr. Vestani. Good morning. Good morning, Your Honor. To please the Court, my name is Lawrence Vestani, and I am here representing Hartford and Twin Cities with my co-counsel, Celestine Montague. The first point I would like to make in response to what Mr. Oshinsky said is he obviously hasn't read the reinsurance contract. The reinsurance contract is very clear. It says we reinsure first, not everything, we reinsure reliance's net liability, which was a very small portion of the ultimate liability under those policies. For policies in force, and, yes, this policy was in force on July 1st, for claims made after the effective date, you cannot take the reinsurance contract and have it have a separate and distinct coverage provision from the underlying insurance policies that it is reinsuring. Under the underlying reliance policy, there was no claim made after July 1st because of the interrelated wrongful acts. All claims were considered made in April or January when the first NETL suit was filed and served. That is black letter law. Judge Kavanaugh was correct in deciding that as a matter of summary judgment. All of the extrinsic evidence that G1 tried to put up is really irrelevant to the determination of the meanings of clear and unambiguous contracts. Mr. Oshinsky also seemed to want to imply that when Hartford bought certain limited assets of reliance, that it took over the entire reliance operation. The asset purchase agreement is clear that only certain limited assets and very limited liabilities were purchased. It is clear that only certain employees were going to become Hartford employees. Despite what G1 says in its reply brief, which was improperly filed, there is tons of evidence on the record that reliance always maintained not only control of this, but control through their own employees, their own coverage counsel, their own claims manager. To settle it. To settle it. In fact, under both a claim servicing agreement and the representations by reliance's own coverage counsel in 2001, reliance did not consider these claims Hartford's claims. They considered them their claims that they retained after the sale to Hartford of limited assets. Another point I would like to raise that Mr. Oshinsky seems to get confused on is when you look at the asset purchase agreement, it was entered on June 30th, 2000. The reinsurance agreement and the first claim service agreement were not entered until September 12th, 2000, at exactly the same time. These agreements were entered into together with the understanding that the claim service agreement would provide the framework for how reliance and Hartford would deal with claims. Hartford would be a TPA. Reliance would have the ultimate say. Testimony is clear on the record. Documents are clear. There is no controverted testimony on that. There is no question on the record that these were interrelated wrongful acts. G1's expert admitted it. G1 admitted it in briefing. Reliance admitted it. Reliance has always taken that position. When you look at the clear case law and the clear language of the policies, these are clearly interrelated wrongful acts. In fact, just so that we get a good picture of what we're talking about, we are talking about a situation where there was only one wrongful act. That was the alleged fraudulent transfer of almost a billion dollars out of a company that was facing. Why don't you address the question? In 2002, you filed a motion to dismiss that said that the final two claims, claims two and three, were not covered because they were filed after the policy expired. Only later on did you then go to the IWA provision, the interrelated wrongful acts provision. They're saying that you can't have your cake and eat it too. Actually, in this case, we can have our cake and eat it too because that was one legal argument. There is no case law that they have cited that says that a legal argument that has never been ruled on cannot be withdrawn and a contrary legal argument put forth. But, in fact, those were not. Conceivably, if you applied New Jersey law. I guess you'd have an eerie question as to whether you apply federal law or New Jersey law. Conceivably, if you applied New Jersey law, you might have a problem there. But not for a legal argument that has never been determined. And if you look at the motion to dismiss, it was not a motion to dismiss filed by Hartford as an insurance carrier saying that this is a coverage position we are taking. It was a motion filed by Hartford as a claims handler saying that there is a fairly debatable coverage question. Therefore, we are not exposed to bad faith as a claims handler. That was never ruled on. That was never dealt with, Hartford's coverage position as a carrier. In 2002, why did you not argue the interrelated wrongful acts provision? I honestly don't know. I wasn't there at that time. But all I can do is give you the basis for what I would say is that they threw out a legal argument that could be made if, after discovery, it was determined that these were, in fact, separate, not the same. Or, therefore, that would be legally, that would be a debatable coverage position. In 2002, they knew the Nettles claim was filed, did they not? Excuse me? In 2002, your side knew the Nettles claim had been filed. Yes. And you had the policy, you had the agreement, which your folks negotiated, which has the interrelated wrongful act provision in the insurance policy that you accepted coverage for after July 1, 2000. Yes. So how did they miss it? I don't know. I'm not asking you. You weren't there. And they may have missed it, and it may have been a mistake, but it wasn't put forth as a coverage position. It was put forth as a basis for saying that it is reasonably debatable that, under New Jersey law, whether or not there is coverage for this, therefore, we cannot be held to bad faith as a claims handler. Okay. When you look at the record, it is undisputed that this reinsurance agreement does not even apply to this claim. A plaintiff's own expert went back and changed his report when he looked closer at the reinsurance agreement and testified that he no longer believed that this reinsurance contract applied. There is no extrinsic evidence to show anything to the contrary with regard to how the reinsurance was handled,  This is a case where Mr. Oshinsky would like to have time at trial to throw out all these theories. He had his opportunity. We had full discovery. The matter was discovery was closed. It was fully briefed. There are, on the record, no facts in controversy that need to be tried. Assuming we look at Mr. Pflugert's testimony, is it consistent? Mr. Pflugert was always consistent. He understood he was getting a new policy. In fact, if you look at Mr. Pflugert's testimony, you will see that well before Hartford even went to Reliance about purchasing assets, he was looking to cancel his Reliance policy and get new coverage. The only reason he didn't do that was the expense. He knew he was getting a new policy. He didn't want a gap in coverage. There is no gap in coverage in this case. Plaintiffs would like you to think there is a big gap in coverage. There is none. All of this is under Reliance's policy, and Reliance has acknowledged that. The problem, obviously, is Reliance is in liquidation. Mr. Pflugert testified he knew he was getting a new policy. What he was talking about with regard to the retroactive date, which actually in this policy is a prior litigation date, is in these policies, because they're claims made, you want to make sure that you're covering for acts that preceded the policy, but the claim is made during the policy. Mr. Pflugert wanted the same prior litigation date so that he wouldn't have a potential gap in coverage, because if the Hartford policy had a prior litigation date of July 15, 2000, and something of new claim arose out of facts before that date, he would have a gap in coverage. Nobody is contending that there was any gap in coverage like that. That was his only concern. He understood and testified clearly Reliance's losses stayed with Reliance. That is the way the insurance policies are clear on. That is exactly what the reinsurance agreement says. In fact, the only testimony on that point was from Mr. Baker, and it's uncontroverted, at Hartford, where he testified that Reliance came to them subsequently and said, we would like you to buy our liabilities pre-July 1. And they went to Hartford and they went to other carriers. This is all on the record. Do you agree that basically the contract resolves this issue, this dispute? Yes. The contracts are clear. They're unambiguous, and you don't need to go to parole evidence. So is there anything else you need to argue? No. If you have no further questions, I thank you for your time. Mr. Bitson, thank you very much. Mr. Oshinsky. I do have a few things, Your Honor, if I may. First off, I wanted to clarify one thing. I think it's clear to the panel, but the so-called interrelated wrongful acts language is in the underlying D&O policy, not in the asset purchase agreement or the reinsurance agreement. The quota share reinsurance agreement, which created Hartford's status as an attorney in fact for Reliance, was actually effective as of July 1, 2000, not at the point in time of the subsequent claims service agreements. At the point in time where Hartford issued the quota share reinsurance agreement and the asset purchase agreement, they took over all of Reliance's business. They took the premiums. They took the liabilities. They took the employees. They even had a provision in one of these two agreements, which were issued at the same time, that brokers who were brokering coverage for Reliance were asked to send the Reliance customers to the Hartford. And that's what happened here. The broker came to G1 and talked to them about switching their coverage to a Hartford piece of paper rather than a Reliance piece of paper. And when Mr. Pfluger was asked about that, as I alluded to in my opening remarks, they clipped his testimony. Record page A2, well, there are two things if I may. Let me just get the first one here. Yeah. The part that they quoted, which the judge in the district court quoted below, was whether he understood that they were two separate policies, and he said yes. Very next question. Okay. And did you get with Hartford, was it your understanding you would get with Hartford the same separation of A and B coverage from C coverage? Whatever Reliance did, Hartford was supposed to do the same thing. Later on he was asked, this is at record, that was record 1328, record 1888, he was asked, was it your understanding that if you undertook the Hartford option, that you would, from whatever the agreed cancel and rewrite date was, that you would then be insured by Hartford from that period forward? There's some objections. He says, the retroactive date would have told me something different. I would have been insured with Hartford since 1997. So the state of mind of Mr. Pfluger is not that some interrelated wrongful acts language is going to knock him out of coverage that he otherwise would have had. And, in fact, their expert, Mr. Bailey, testified below, or actually put in a report at record 1390 where he said it would be unusual in his experience. In fact, he can't think of a circumstance where he's seen an interrelated wrongful acts provision applied to two separate policies. And what they had here, they took these two policies and they stuck on them an absolute tie-in limits endorsement on the second policy. And they said, no matter what, these two policies are only going to be effective for $15 million. If you take Hartford's argument literally, these should have been two separate policies for $30 million and not one policy for $15 million. So they did everything they could to create the impression in Mr. Pfluger's mind and his testimony is at least confusing on this. I think it actually, the weight of it actually supports our position that he understood that he was getting one policy and that he would not wind up with less coverage than he had before. The bottom line is that Hartford's position is not so much a question of law that they switched. It was opportunistic. But didn't Pfluger also testify that he understood that the Hartford policy came into effect on July 1? He did. Yes, he did, Your Honor. But he also, he understood, he didn't see this in his mind, and I'm sure Your Honors have seen his entire testimony, he didn't see this in his mind as a separation between these policies. He saw this as a continuation of the Reliance coverage with Hartford's money behind the coverage. And that is why when the second and third cases came in, the creditors committee case and the CCR case, our client gave notice to Reliance. Which I think that fact confirms their state of mind. They thought they had continuous coverage. So they gave notice to Reliance. Hartford comes back and says, sorry, that policy was canceled. These claims do not relate back. And that I think was a fact argument and not a legal argument. And I think judicial estoppel or something close to it should apply to what Hartford did here. When our guys realized that policy had been continued and they should have gone under the continuation of the policy for the next two years, Hartford said, sorry, you can't do that. These claims do relate back and they're barred by the interrelated wrongful ask clause. This is not what they argued initially. They switched their position for an opportunistic result. We've got the argument. I think you've got it, Your Honor. If I can just have one second to check my notes and see if there's anything else. Yeah, if I may just make one further point. There was no evidence of any actual Reliance employee involvement post-July 1, 2001. As I said in my opening remarks, this was Hartford dealing with itself. And I think that at a minimum, this Court should reverse the lower court's decision and send it back for further proceedings. And I thank you for your attention. I'm sorry to believe you're going to head back to California, but I wish you the best. Thank you, Mr. Harris. Thank you. Take care. The case was very well argued. We will take this matter under advisory. Speaking only for myself, I intend to resolve the moose issue no matter how tangential it may seem. The original logo on the first policy was a snake, which I think is very appropriate. And then it switched to the Hartford moose. And I was hoping I'd be able to argue just the opposite, that the moose became a snake. But unfortunately, I don't have that. I have no comment. But we think in any event, the moose and the snake should be sent back to the District Court. Thank you. Very good. Thanks, General.